# 16-2482(L)

## 16-2484(CON), 16-2530(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆

THOMAS WACKER, MARK GRUMET, DANIEL SHAK, SHK DIVERSIFIED, LLC,

*Plaintiffs-Appellants,*

—v.—

JP MORGAN CHASE & CO., J.P. MORGAN CLEARING CORP.,
J.P. MORGAN SECURITIES, LLC, J.P. MORGAN FUTURES, INC.,
merged with and into J.P. Morgan Securities LLC,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

### BRIEF OF DEFENDANTS-APPELLEES

---

AKASH M. TOPRANI
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

DARYL A. LIBOW
AMANDA F. DAVIDOFF
NICHOLAS M. DICARLO
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.,
Suite 700
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees JPMorgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities LLC, and J.P. Morgan Futures Inc. certify as follows:

JPMorgan Chase & Co. is a nongovernmental entity with no parent corporation. No publicly held corporation owns 10 percent or more of JPMorgan Chase & Co.'s stock.

J.P. Morgan Securities LLC is a wholly owned subsidiary of J.P. Morgan Broker-Dealer Holdings Inc. No other corporation is a parent of J.P. Morgan Securities LLC.

J.P. Morgan Clearing Corp. has been merged into J.P. Morgan Securities LLC. J.P. Morgan Clearing Corp. no longer exists as an independent entity.

J.P. Morgan Futures Inc. has been merged into J.P. Morgan Securities LLC. J.P. Morgan Futures Inc. no longer exists as an independent entity.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................i

INTRODUCTION ..............................................................................1

STATEMENT OF JURISDICTION........................................................4

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE FACTS ............................................................5

    A.    The Parties ...........................................................................5

    B.    Silver Futures Contracts and Calendar Spreads .........................6

    C.    Contango and Backwardation ..................................................7

    D.    The COMEX Exchange...........................................................8

    E.    Silver Forwards and Over-the-Counter Silver Trading..............9

STATEMENT OF THE CASE..............................................................10

    A.    The District Court Dismisses Plaintiffs' Original Complaints. ...............10

    B.    Plaintiffs Attempt To Replead Their Antitrust Claims. ..........................12

        1.    Allegations of "Market Power".......................................12

        2.    Allegations of "Willful Acquisition or Maintenance of Monopoly Power Via Exclusionary Conduct" ...............13

        3.    Allegations Concerning JPMorgan's "Motives" ...........15

        4.    Allegations Regarding Injury.........................................16

    C.    The District Court Dismisses the Second Amended Complaints With Prejudice. ..........................................................17

    D.    Plaintiffs Appeal Few of Their Scattershot Claims.................18

SUMMARY OF ARGUMENT ..................................................18

STANDARD OF REVIEW ..................................................22

ARGUMENT ..................................................22

I.   The District Court Correctly Held that Plaintiffs Failed To Adequately Allege Willful Acquisition or Maintenance of Monopoly Power. ...............22

   A.   Plaintiffs Have Not Adequately Alleged Anticompetitive Conduct. .......23

      1.   Plaintiffs Have Not Even Attempted To Plead Conduct that Is Anticompetitive or Exclusionary. ..............................................23

      2.   Plaintiffs Fail To Allege that JPMorgan Engaged in Any Uneconomic Trades or Manipulation. ............................................24

      3.   The Complaints Do Not Adequately Plead Predatory Bidding. .........................................................................36

   B.   Plaintiffs Fail To Allege that JPMorgan Acted with Anticompetitive Intent. ..............................................38

II.   The District Court's Judgment Can Also Be Affirmed on the Basis that Plaintiffs Fail To Allege that JPMorgan Held Monopoly Power. ..........41

   A.   The District Court Recognized that Plaintiffs' Proffered "Market" Is "Implausible" but Held that Plaintiffs Were Not Required To Allege a Plausible Relevant Market. ........................................43

   B.   To Allege Monopoly Power, a Complaint Must Allege a Plausible Antitrust Market. ..............................................44

III.   The District Court's Judgment Can Also Be Affirmed on the Basis that Plaintiffs Lack Antitrust Standing. .........................................49

CONCLUSION ..................................................50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014) ..................................................................24, 44

*Affinity LLC* v. *GfK Mediamark Research & Intelligence, LLC*,
   547 F. App'x 54 (2d Cir. 2013) ........................................................41

*In re Aluminum Warehousing Antitrust Litig.*,
   2016 WL 4191132 (2d Cir. Aug. 9, 2016) ........................................23

*In re Aluminum Warehousing Antitrust Litig.*,
   95 F. Supp. 3d 419 (S.D.N.Y. 2015) .................................................50

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009)................................................................35, 38, 44

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985).........................................................................25

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
   495 U.S. 328 (1990).....................................................................23, 52

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)...................................................................35, 43, 44

*Biro* v. *Conde Nast*,
   807 F.3d 541 (2d Cir. 2015) ............................................................35

*Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)......................................................................41, 54

*Chapman* v. *N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) ............................................46, 48, 49, 51

*City of New York* v. *Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011) ............................................................45

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
   2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) .......................27, 31, 32

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ....................................................31

*Concord Assocs., L.P.* v. *Entm't Properties Trust*,
817 F.3d 46 (2d Cir. 2016) ....................................................................23, 48, 49

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012) ......................................................*passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) ...................................................................39

*Diesel* v. *Town of Lewisboro*,
232 F.3d 92 (2d Cir. 2000) ................................................................................19

*Fort Wayne Telsat* v. *Entm't & Sports Programming Network*,
753 F. Supp. 109 (S.D.N.Y. 1990) ......................................................................35

*Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) .................................................................................52

*Geneva Pharm. Tech. Corp.* v. *Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ...............................................................................45

*Heerwagen* v. *Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006) .............................................................48, 49, 50, 51

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
962 F. Supp. 2d 606 (S.D.N.Y. 2013) ................................................................42

*McWane, Inc.* v. *F.T.C.*,
783 F.3d 814 (11th Cir. 2015) ............................................................................49

*Minpeco, S.A.* v. *Hunt*,
718 F.Supp. 168 (S.D.N.Y. 1989) .......................................................................47

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ...............................................................................34

*NYNEX Corp.* v. *Discon, Inc.*,
525 U.S. 128 (1998) ...........................................................................................53

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................................25

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret.*
    *Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .............................................43

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) .........................................19, 24, 50, 52

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) .............................................25

*Sell It Soc., LLC* v. *Acumen Brands, Inc.*,
    2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015)...................................53

*Sveaas* v. *Christie's Inc.*,
    452 F. App'x 63 (2d Cir. 2011) .........................................30

In re *Term Commodities Cotton Futures Litig.*,
    2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ........................35, 37, 50

In re *Term Commodities Cotton Futures Litig.*,
    2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) ..................................40

*Todd* v. *Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................25, 45, 51

*Tops Markets, Inc.* v. *Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) .........................................49, 50

*United States* v. *Grinnell Corp.*,
    384 U.S. 563 (1966)....................................................24

*United States* v. *Restrepo*,
    986 F.2d 1462 (2d Cir. 1993) ..........................................19

*U.S. Football League* v. *Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ........................................24, 41, 44

*USAirways Grp., Inc.* v. *British Airways PLC*,
    989 F. Supp. 482 (S.D.N.Y. 1997) .....................................53

*Verizon Commc'ns* v. *Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)........................................................24, 44

*Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312 (2007)....................................................21, 39, 40

*In re Zinc Antitrust Litig.*,
2016 WL 3167192 (S.D.N.Y. June 6, 2016) ................................50, 52

**Statutes**

7 U.S.C. §§ 1, *et seq.*........................................1, 11, 12, 19, 25

15 U.S.C. § 2 ...........................................................*passim*

28 U.S.C. § 1291 ...........................................................4

28 U.S.C. § 1331 ...........................................................4

28 U.S.C. § 1337 ...........................................................4

N.Y. Gen. Bus. Law § 340 ..............................................12, 19

N.Y. Gen. Bus. Law § 349 ..............................................12, 19

**Rules**

CFTC Rule 180(a) ......................................................11, 19

Fed. R. Civ. P. 8 .....................................................27, 35

Fed. R. Civ. P. 12(b)(6)...................................................4

## INTRODUCTION

The courts are not insurance policies for trading losses. Yet that is precisely what Plaintiffs-Appellants—each sophisticated futures traders—sought to accomplish with this litigation. In 2011, Plaintiffs used trading positions called "calendar spreads" to speculate that the price of silver futures would be lower in the near term than in later years. When that did not happen, Plaintiffs' positions came under pressure, Plaintiffs were unable to meet their margin calls and they ultimately liquidated their positions at a loss. Based on the assertion that their trading strategies were "sound," Plaintiffs contend that the fault lies with Defendants-Appellees (JPMorgan and three of its subsidiaries), who Plaintiffs conclusorily allege manipulated the market to cause Plaintiffs' losses. But Plaintiffs muster no plausible allegations to show that JPMorgan has engaged in unlawful conduct that would give rise to any cognizable claim.

Plaintiffs' allegations, albeit inadequately pled, sound in the nature of commodities manipulation, but because those claims were time-barred, Plaintiffs try to wedge their alleged "injury" into an antitrust claim. Plaintiffs make little effort, however, to hide that their recast claims are untimely Commodities Exchange Act claims. Indeed, they accuse JPMorgan of "manipulating" commodities silver futures spreads to "squeeze" them and rely on an inapt "benchmark" to try and establish price "artificiality." But to state a claim under

Section 2 of the Sherman Act, Plaintiffs must adequately allege that JPMorgan engaged in anticompetitive conduct with anticompetitive intent, that JPMorgan possessed sufficient market power in the first place to affect prices, and that they suffered antitrust injury. Plaintiffs have done none of this.

Plaintiffs' theory of anticompetitive conduct is that JPMorgan made "uneconomic" bids and offers for silver futures and then reported those bids and offers to the committee that sets settlement prices. By doing so, Plaintiffs argue, JPMorgan artificially pushed up the prices of short-term silver futures relative to long-term (*i.e.* the opposite of Plaintiffs' positions). But Plaintiffs have alleged no plausible basis for asserting that the bids, offers or reports at issue were "uneconomic." They try to do so by comparing JPMorgan's reporting of its bids and asks to a supposed "benchmark" for over-the-counter silver forwards. This is an apples-to-oranges comparison, as the district court found, because the purported "benchmark" measures silver forward prices for a year out, whereas the alleged manipulation was of futures up to four years out. Plaintiffs also conclusorily assert that JPMorgan's bids and offers were out of line with other trading in the market, but without ever alleging a single bid, offer or trade by JPMorgan or anyone else. Finally, grasping at straws to manufacture anticompetitive conduct, Plaintiffs argue that this is a "predatory bidding" case, where JPMorgan bid up the price of certain "inputs," and sold "outputs" for below-market prices, in order to price competitors

out of the market.  Not only do Plaintiffs fail to cite to any court that has ever applied this framework to futures contracts, but they ultimately fail to plausibly allege any relevant "input" or "output," much less any predatory conduct.

The motives Plaintiffs offer for JPMorgan's supposed scheme are equally flawed.  Plaintiffs do not allege that JPMorgan had anything to gain on its own silver futures trading; instead, they allege that JPMorgan *might* have benefited from depressed physical silver prices in possible transactions with silver producers. As the district court concluded, this motive is based on nothing more than speculation, demonstrated by Plaintiffs' inability to allege a single factual detail about these supposed transactions.  Plaintiffs also contend that JPMorgan had the incentive to acquire Plaintiffs' positions cheaply, but that is indistinguishable from a normal profit motive, and not reflective of any *anticompetitive* intent.

Independent of Plaintiffs' failure to allege anticompetitive conduct or intent, the judgment below can be affirmed for two additional reasons.  *First*, Plaintiffs failed to adequately allege that JPMorgan possessed monopoly power because, as the district court found, Plaintiffs failed to allege a plausible antitrust market that includes all reasonably interchangeable products.  The district court held that Plaintiffs had nonetheless sufficiently pled market power on the mistaken assumption that they were not required to plead an antitrust market—and as this Court's precedents show, that was in error.  *Second*, the complaints allege at most

-3-

harm only to the speculators who brought this litigation, not to competition generally, and therefore do not allege antitrust injury.

In the end, Plaintiffs bet on the market, and bet wrong. They allege no plausible facts to show that anyone else is to blame for their losses, and certainly have failed to adequately allege any of the elements of a Sherman Act monopolization claim. No amount of creative pleading will solve these deficiencies. The district court recognized that, and so should this Court. The judgment below should be affirmed.

## STATEMENT OF JURISDICTION

The district court originally had jurisdiction over these consolidated actions pursuant to 28 U.S.C. §§ 1331 and 1337. The district court dismissed Plaintiffs' actions with prejudice under Federal Rule of Civil Procedure 12(b)(6), and this Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held that Plaintiffs failed to allege the willful acquisition or maintenance of monopoly power, as required to state a Sherman Act Section 2 claim, where (a) the complaints do not allege anticompetitive conduct, because (i) they attempt only to allege price manipulation of silver futures spreads, but without pleading any anticompetitive or exclusionary behavior, (ii) even if alleged price manipulation alone could be anticompetitive

-4-

within the meaning of the Sherman Act, Plaintiffs rely on an inapposite benchmark and conclusory assertions to plead that "uneconomic" manipulation occurred, and (iii) the "predatory bidding" theory of anticompetitive conduct is inapplicable on these facts; and (b) Plaintiffs' allegations of anticompetitive intent rest on speculation about unidentified transactions that Defendants *might* have undertaken, and normal profit motives unmoored from *anticompetitive* intent.

2.    Whether Plaintiffs failed to adequately plead that Defendants possessed monopoly power, where they failed to identify a plausible antitrust "market" in which Defendants acquired or possessed such "power," a predicate for pleading a Section 2 claim.

3.    Whether Plaintiffs failed to adequately plead antitrust standing as required to state a Section 2 claim, because allegations that three traders were excluded from a "market" pleads at most harm to competitors, not to competition.

**STATEMENT OF THE FACTS**

**A.    The Parties**

Plaintiffs-Appellants are a hedge fund and three sophisticated commodities traders, with over 75 years of trading experience between them, who engaged in speculative silver futures trading during late 2010 and early 2011 (the "Relevant Period").  (JA-455-56, 556, 657.)  Daniel Shak, a metals trader and professional poker player who has experience with commodities manipulation

-5-

actions,[1] ran Plaintiff SHK Diversified, LLC during the Relevant Period. (JA-455-56.) Mark Grumet formerly led the white metals trading desk at Drexel Burnham and AIG Trading Corp., and now trades silver futures contracts for his own account. (JA-657.) Thomas Wacker is a former JPMorgan employee who is now a silver and gold futures trader. (JA-556.)

Defendants-Appellees are JP Morgan Chase & Co. and three of its subsidiaries, J.P. Morgan Securities LLC and two entities that have now been merged into J.P. Morgan Securities LLC (J.P. Morgan Clearing Corp. and J.P. Morgan Futures, Inc.) (together, "JPMorgan"). (JA-456.)

## B.    Silver Futures Contracts and Calendar Spreads

"A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future" for an agreed-upon price. (JA-457.) Trades of silver futures contracts "have two sides": the "long" position represents the buyer who is responsible for taking delivery of physical silver at contract

---

[1]    In 2013, the CFTC charged Shak and one of his funds with attempting to manipulate crude oil futures. (JA-298.) A November 2013 CFTC Consent Order imposed a $400,000 penalty, permanently banned him from trading in any crude oil markets, and banned him for two years from trading CFTC-regulated futures contracts during the closing period. (JA-298; *see also* JA-300-11.) In September 2014, the CFTC charged Shak with violating the order "by trading two outright June 2014 gold futures contracts during the closing period." (JA-298; *see also* JA-313-23 (CFTC complaint).) On March 27, 2015, Shak agreed to a consent order extending his trading prohibition by two years and imposing a $100,000 penalty. (JA-325 (CFTC press release); *see also* JA-327-38 (consent order).)

-6-

expiration, while the "short" represents the seller who is obligated to make delivery of the silver.  (JA-457; *see also* JA-461.)  On a daily basis, a futures contract is valued at a settlement price set by an exchange.  (JA-458.)

A "calendar spread" consists of offsetting positions in two futures contracts.  (JA-459.)  A "long" calendar spread is a long position in a futures contract in a particular month and a short position of the same quantity in a later month.  (JA-459.)  Conversely, a "short" calendar spread is a short position in the futures contract in a particular future month and a long position of the same quantity in a later month.  (JA-459.)  The closer-in-time month in a calendar spread is known as the "nearby" month, while the more distant month is called the "deferred" month.  (JA-450.)  Traders profit on calendar spreads when they predict correctly how the price of the futures contract in the deferred month will move compared to the price in the nearby month.  (JA-459.)

### C. Contango and Backwardation

Futures contracts are typically more expensive at longer-term maturities, a phenomenon called "contango."  (JA-460.)  This is because, all else equal, a commodity requiring delivery further out in time incorporates the cost of storage, interest expense and insurance, which accumulate over time.  (JA-460.)  However, "[i]f there is a shortage or tightness in immediate supply for a commodity, traders are willing to pay a higher premium for near-term supply

-7-

relative to long-term supply." (JA-461.) Accordingly, in such situations, futures contracts for nearby months will be more expensive than longer term maturities, a phenomenon known as "backwardation." (JA-461.)

### D. The COMEX Exchange

As relevant here, silver futures contracts may be traded on platforms offered by the Commodity Exchange, Inc. ("COMEX"). (JA-457, 461.) COMEX provides standardized silver futures contracts with delivery dates beginning with the next calendar month and extending as far as 5 years into the future. (JA-457.) As a condition of holding COMEX futures contracts, a party is subject to margin requirements, which refers to money held by the clearinghouse as security for the trader's performance at contract expiration. (JA-488.) The margin requirement for a contract at any given time is dictated by, among other things, COMEX regulations and settlement prices. (JA-457.)

On a daily basis, COMEX sets settlement prices for futures contracts based on trading activity between 1:24 p.m. and 1:25 p.m. Eastern Standard Time, which is the minute right before trading ends (the "close"). (JA-458.) As a practical matter, this procedure is commonly followed for active month futures—*i.e.* futures for the most nearby months—but there is often no trading activity at the close for longer-term futures. For those contracts, settlement prices are set by the COMEX settlement committee—working "in conjunction with market

participants" (JA-343)—based on "spread bids/asks actively represented" throughout the day (JA-458), as well as "earlier data or other available market information" (JA-458).

### E.    Silver Forwards and Over-the-Counter Silver Trading

Silver forwards are a different kind of agreement to buy silver in the future at an agreed-upon price.  These transactions are negotiated "over-the-counter" or "OTC," meaning between private parties without the participation of an exchange.  (JA-461.)  The details and pricing of OTC silver forward contracts generally are not published or otherwise publicly available.  (JA-461.)  However, a limited indicator of OTC forward prices, the "Silver Indicative Forward Mid Rates" ("SIFO"), was available during the Relevant Period through the London Bullion Market Association ("LBMA"), a trade association.  (JA-462-63.)   SIFO represented an estimate of the "forward price" for silver based on a trimmed average of submissions from at least six contributors (including JPMorgan).  (JA-462.)  SIFO was calculated for five different tenors: 1, 2, 3, 6 and 12 months from the present—accordingly, no SIFO rate estimated the cost of silver for more than a year into the future.  (JA-462.)

## STATEMENT OF THE CASE

### A.  The District Court Dismisses Plaintiffs' Original Complaints

Plaintiffs commenced these three lawsuits in New York Supreme Court, and on February 11, 2015, Defendants removed the actions to the U.S. District Court for the Southern District of New York (Engelmayer, J.).  (JA-406.) Except for allegations regarding the liquidation of Plaintiffs' positions and their purported injuries, Plaintiffs' complaints asserted substantially similar claims, and were consolidated for briefing.[2]

Plaintiffs alleged that in late 2010 and early 2011, they "had taken a short silver spread position" on COMEX, meaning they had bet that the price of silver futures in certain nearby months (*e.g.*, March 2011 or December 2011) would be lower than the price of silver futures in certain deferred months (*e.g.*, December 2012, December 2013, or December 2014).  (JA-63; *see also* JA-44-45.)  Plaintiffs' bet did not pay off.  By January 2011, nearby COMEX futures prices were higher than prices in later months—meaning that the market was experiencing backwardation—forcing Plaintiffs to post additional margin. Plaintiffs alleged that JPMorgan "manipulated" the market to achieve this "artificial" result, and that Plaintiffs ultimately unwound their positions at

---

[2]  Where the three complaints at issue do not differ among themselves, this brief refers to the Shak complaints.

substantial losses, including through trades with JPMorgan. (JA-64-67, 149-50, 232-33.)

Plaintiffs each advanced (i) manipulation claims under the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, and CFTC Rule 180.1(a); (ii) monopolization, attempted monopolization, and conspiracy to monopolize claims under the Sherman Act, 15 U.S.C. § 2, and the Donnelly Act, N.Y. Gen. Bus. Law § 340; (iii) deceptive business practices claims under N.Y. Gen. Bus. Law § 349; and (iv) unjust enrichment claims.

On January 12, 2016, the district court dismissed most of Plaintiffs' claims with prejudice. (SPA-42.) Because the original complaints were filed in 2015 but pertained to alleged manipulative conduct occurring in 2010 and 2011, all of the claims—with the exception of a portion of the antitrust claims related to trades occurring near the end of the alleged period of manipulation—were time-barred under the applicable statutes of limitations. (SPA-9-21.)

The district court likewise dismissed the remaining timely antitrust claims (SPA-22-41), noting that they "do not present a paradigmatic Sherman Act § 2 claim" and there was "good reason to surmise that the antitrust claims were included as a hedge against the possibility (now realized) that the CEA claims would be held time-barred." (SPA-22-23.) The district court ruled that Plaintiffs had adequately alleged monopoly power, an element of a Section 2 claim—despite

-11-

finding a "complete absence of adequate pleadings on the issue of defining a market"—because Plaintiffs pled market power through "direct evidence of anticompetitive effects" rather than through indirect evidence of market share. (SPA-27-28, 32-33). But the court found that the complaints failed to plead willful acquisition or maintenance of market power, another Section 2 element, because they "not only lack[ed] specifics . . . [but] fail[ed] to connect this conduct to a scheme to willfully acquire or maintain monopoly power." (SPA-38.) Instead, the complaints "simply conclude—rather than show—that JPMorgan's bids and offers were 'uneconomic' and declare, *ipse dixit*, there was 'no legitimate justification' for reporting significantly more tightness in the spreads market than in the over-the-counter markets." (SPA-37.) The court granted Plaintiffs leave to replead their antitrust claims. (SPA-42.)

### B. Plaintiffs Attempt To Replead Their Antitrust Claims

Plaintiffs' January 26, 2016 amended complaints (JA-447-746) are substantially similar to their original pleadings, which focused on commodities manipulation. Plaintiffs' allegations, to the extent they relate to their remaining Sherman Act claim, are described below:

### 1. Allegations of "Market Power"

Plaintiffs conclusorily allege that JPMorgan had power over and manipulated "the silver futures spread market and in particular the 'long-dated'

silver futures spread market." (JA-466.) The alleged "geographic" market is "physical and electronic trading parameters of the listed silver futures contract on the COMEX." (JA-466.) Plaintiffs do not allege that Defendants had any particular share of the proffered market; rather, they assert vaguely that Defendants were "major market participants." (JA-543.)

### 2. Allegations of "Willful Acquisition or Maintenance of Monopoly Power Via Exclusionary Conduct"

Plaintiffs allege (also in conclusory terms) that JPMorgan "force[d]" Plaintiffs out of the "market" by "artificially increas[ing] the profitability of its long calendar spreads." (JA-451.) Plaintiffs assert that JPMorgan created such "artificial" futures spreads by making "large manipulative trades that repeatedly caused sudden, unreasonable and artificial fluctuations" in prices, especially "toward the close of trading" (known as "banging the close"). (JA-451-52, 470-71, 545-46.) Then, JPMorgan supposedly reported these artificial trades to the COMEX settlement committee in order to set settlement prices favorable to JPMorgan (and adverse to Plaintiffs). (JA-472-73.) Plaintiffs identify 14 days in February 2011 where JPMorgan, through an "agent," supposedly manipulated the COMEX settlement committee (by "harang[uing]" its staff) to adopt artificial settlement prices. (JA-472-73.) On each of these days, Plaintiffs allege that the spread that JPMorgan quoted to COMEX "had no bearing on where the market had

-13-

been trading the entire day"—while simultaneously alleging that "there had been no trading activity" that day. (JA-473-82.)

Plaintiffs also describe market patterns purporting to demonstrate that silver futures spreads during the Relevant Period were "artificial." (JA-500-42.) In particular, Plaintiffs assert that an "extended period of backwardation" occurred during January 2011 to May 2011 in the silver futures market, something that they allege is "extremely rare." (JA-461, 500-05.)[3] Plaintiffs proffer the work of an unidentified "consulting expert," who sought to "establish the artificiality of the silver futures spreads" during early 2011 by showing that "silver futures spreads diverge[d]" from spreads in the OTC market at that time, as measured by SIFO. (JA-505-42.) The "expert" conducted this analysis by comparing 12-month SIFO (which measures OTC forward silver prices one year in the future) with the futures spreads at issue in this case, each of which had a leg farther than a year (and up to

---

[3] Plaintiffs also allege, however, that backwardation is "a basic pricing system in commodities futures trading," occurring "mainly because the demand for supplies in the near future is greater than the demand for supplies at some distant time." (JA-461 (quoting Jerry M. Rosenberg, Dictionary of Banking and Finance 41 (1982)).) Critically, Plaintiffs concede that there is someone on "the other side" of every spread (JA-469), which means that some market participants expect (and indeed put money on) the occurrence of backwardation. (*See also* JA-459 (admitting that futures traders make a profit based on the movement of the market).)

-14-

four years) into the future.[4]  (JA-505-42.)  Plaintiffs allege that 12-month SIFO could serve as a reliable "benchmark" for silver spread prices because it historically tracked futures spreads, but the complaints also include data showing that 12-month SIFO frequently diverged from long-dated futures spreads prices, including during periods where Plaintiffs allege no manipulation.  (JA-464-65, 483-84.)  Plaintiffs likewise allege a "divergence between silver futures spreads and JP Morgan's SIFO submissions," but one that was "similar to the comparison of the silver futures spreads with the corresponding SIFO generally."  (JA-538-39.)

### 3.    Allegations Concerning JPMorgan's "Motives"

Plaintiffs assert that "one of JP Morgan's primary possible motives for manipulating the spreads to artificial levels was to benefit itself in the context of physical transactions with producers, which were based on COMEX silver futures price settlements."  (JA-496.)    Plaintiffs assert that by "passing along" the "artificially depressed" COMEX settlement price to counterparties, JPMorgan could potentially make these transactions "highly profitable."  (JA-495.)  But the

---

[4]      The spreads at issue in this case are:  for Shak, a short December 2011 silver futures position against long positions in December 2012 and December 2013 (JA-491); for Wacker, short positions in December 2011, December 2012, and December 2013 and long positions in December 2014 (JA-590); and for Grumet, a spread position between December 2012 and December 2014 (JA-690).  Shak also alleges that he held a short March 2011 position against long positions in July and September 2011, but Plaintiffs do not claim any manipulation of these contracts. (Br. 11; JA-491, 507-13.)

complaints contain *no* factual allegations regarding any JPMorgan physical silver transactions (*e.g.*, when, where, how many, or with whom they occurred). Rather, they allege only that on February 5, 2011, Grumet "was informed" by his broker that the broker had heard from other brokers that Gottlieb, a JPMorgan employee, was "passing along the COMEX settlement price to" "a customer of JP Morgan." (JA-495.) Plaintiffs also allege without factual basis that JPMorgan's traders "desire[d] to improve their marked-to-market profit and loss positions" and that "JP Morgan was also motivated to manipulate the silver futures market because it was possible." (JA-496-97.)

### 4. Allegations Regarding Injury

Shak alleges that he was "under significant distress" by mid-January 2011 because COMEX had increased margin requirements "four times – 60%" between November 2010 and February 2011. (JA-488.) According to Shak, he then tried to exit his losing positions by paying other traders to assume the positions. (JA-488-89.) JPMorgan allegedly assumed certain of Shak's spreads for a fee of $2.1 million. (JA-488-89.) After Shak liquidated his positions, in January and February 2011, Wacker (JA-590) and Grumet (JA-690) liquidated their positions at a loss, allegedly by selling at least some of those positions to JPMorgan. (JA-590-591, 690-92.) The complaints claim that "[i]f Plaintiffs had been able to hold the calendar spread positions through [the alleged] artificial

-16-

period, their gains would have been many multiples of their losses, totaling no less than $100 million." (JA-454.) JPMorgan was allegedly on the other side of at least some of those positions before Plaintiffs' liquidation, and would have lost money. (JA-500, 591, 691.)

### C. The District Court Dismisses the Second Amended Complaints With Prejudice

On June 29, 2016, the district court again dismissed Plaintiffs' antitrust claims, this time with prejudice. (SPA-43-65.) The court held that the complaints still failed to adequately allege sufficient facts to show that JPMorgan's conduct was uneconomic, irrational, and "without legitimate justification," and therefore amounted to "exclusionary or anticompetitive conduct." (SPA-57, 63.) Nothing in the Second Amended Complaints had cured Plaintiffs' "unsubstantiated '*ipse dixit*' that JP Morgan's price representations were uneconomic." (SPA-58.) In so finding, the court noted Plaintiffs' "failure both to explain why SIFO should track silver future spreads, and to concretely plead that it did so consistently," let alone that it provided "the only rational price for long-dated silver future spreads" in early 2011. (SPA-60-61.) The court further found Plaintiffs' allegations regarding JPMorgan's "motives" to be "conclusory." (SPA-62.)

### D. Plaintiffs Appeal Few of Their Scattershot Claims

Before this Court, Plaintiffs have abandoned the lion's share of their claims. Plaintiffs do not contest that their CEA, CFTC Rule 180.1(a), N.Y. Gen. Bus. Law § 349, Donnelly Act,[5] and unjust enrichment claims were correctly dismissed. Plaintiffs also have dropped their Sherman Act antitrust conspiracy and attempted monopolization claims. (SPA-39-40 & n.16.) Only their Section 2 monopolization claim remains before this Court on appeal.

### SUMMARY OF ARGUMENT

I. To survive a motion to dismiss their Sherman Act monopolization claim, Plaintiffs must plausibly allege JPMorgan's "willful acquisition or maintenance of [market] power." *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). This requires allegations that JPMorgan engaged in anticompetitive conduct, with anticompetitive intent. But all Plaintiffs attempt (and fail) to do, in what is nothing more than a transparent repackaging of their commodities manipulation claims, is allege artificial prices— and that is patently inadequate for an antitrust claim, which requires allegations of harm to *competition*. *See* Section I.A.1., *infra*.

---

[5] Plaintiffs purport to preserve their Donnelly Act claims in a single footnote, but it is well-established that "an argument mentioned only in a footnote" is not "adequately raised or preserved for appellate review." *Diesel* v. *Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) (quoting *United States* v. *Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993)).

Even if supposed price manipulation could amount to anticompetitive and exclusionary conduct, Plaintiffs' allegations here are inadequate. Their theory is that JPMorgan made "artificial" bids and asks, with the sole purpose of reporting those artificial bids to the COMEX settlement committee, thereby manipulating the prices of long-dated silver future calendar spreads. But to proceed, they must plausibly allege that JPMorgan's bids and submissions were uneconomic and irrational, which they fail to do. Plaintiffs rely almost entirely on an unidentified expert's analysis that compares silver futures calendar spread prices to SIFO, but that is an improper comparison: SIFO estimates silver prices only up to a year out, while calendar spreads estimate silver prices farther into the future—up to four years. (JA-462, 467.) *See* Section I.A.2.a, *infra*.

Plaintiffs also contend that JPMorgan's bids and asks on certain dates diverged from trading activity by other market participants earlier on those days. (Br. 30, 39.) This theory fails because Plaintiffs never actually identify a single bid, ask or trade by JPMorgan or anyone else (JA-470-81), and even if they had, they do not explain why all participants in a speculative market should act identically. Plaintiffs also point out that at the time of JPMorgan's unidentified "uneconomic" trades, the market was in the "rare" state of backwardation. This is irrelevant, because under Plaintiffs' own theory of the case, the market was

supposed to be backwardated at that time, just to a different extent. *See* Section I.A.2.b., *infra*.

Plaintiffs additionally attempt to cure these deficiencies by forcing their claims into the framework of predatory bidding under *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 325 (2007). But that framework makes no sense here. Predatory bidding refers to a situation where a predator bids up the price of an "input" (like wood) and sells "outputs" (like pencils) for below-market costs, so that other firms (like other pencil manufacturers) are unable to make a profit and leave the market. Plaintiffs struggle and ultimately fail to apply predatory bidding to this case, for the obvious reason that it was never meant to be used in the context of the futures market. *See* Section I.A.3., *infra*.

Nor do Plaintiffs adequately allege that JP Morgan acted with anticompetitive intent—indeed, they offer no plausible motive for JPMorgan's alleged scheme. Plaintiffs assert that it is common for entities like JPMorgan to transact in physical silver, and JPMorgan might have depressed futures prices in order to profit on *possible* purchases of physical silver. But Plaintiffs allege no actual physical silver transactions by JPMorgan (JA-495-96), leaving their motive allegations, as the court concluded below, wholly speculative. Plaintiffs also contend that JPMorgan had the motive to acquire Plaintiffs' positions cheaply, but

-20-

that is indistinguishable from a normal competitive profit motive and in no way anticompetitive. *See* Section I.B., *infra*.

II. Plaintiffs must also plausibly allege that JPMorgan possessed monopoly power in a relevant market, but Plaintiffs fail to adequately plead a relevant market in which JPMorgan supposedly had power. As the district court found, Plaintiffs' proffered market—"the silver futures market and in particular the 'long-dated' silver futures spread market"—is implausible, because that market definition does not even purport to include all interchangeable substitute products (like OTC silver). (SPA-26-27.) The district court nonetheless found Plaintiffs' allegations of market power sufficient based on the mistaken impression that the way Plaintiffs alleged market power—through direct evidence of anticompetitive effects rather than market share—relieved them of the burden of pleading a plausible antitrust market. (SPA-32.) That is incorrect. This Court has held time and time again, including this year in *Concord Associates, L.P.* v. *Entertainment Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016), that a Section 2 monopolization plaintiff must allege a plausible antitrust market, and this Court has never indicated that a plaintiff alleging market power through "direct evidence of anticompetitive effects" (as opposed to market share) bears a lower burden. *See* Section II, *infra*.

III. To establish antitrust standing, Plaintiffs are required to plead that they suffered antitrust injury, meaning that their "loss stems from a

competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 344 (1990). But Plaintiffs allege no impact on *competition* arising from the conduct that supposedly injured them, such as consumers paying supra-competitive prices, limiting of consumer choice, or that potential competitors face heightened barriers to enter the market. Accordingly, Plaintiffs lack standing to pursue their antitrust claims. *See* Section III, *infra*.

## STANDARD OF REVIEW

This Court "review[s] de novo the grant of a motion to dismiss." *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 4191132, at *4 (2d Cir. Aug. 9, 2016).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO ADEQUATELY ALLEGE WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER.

A claim for monopolization under Section 2 of the Sherman Act requires a plaintiff to adequately allege "willful acquisition or maintenance of [market] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo*, 315 F.3d at 105 (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). To that end, Plaintiffs must plead that JPMorgan engaged in "anticompetitive conduct," *Verizon Commc'ns* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 407 (2004), coupled with "proof of [anticompetitive] *intent*," *U.S. Football League* v. *Nat'l Football League*, 842 F.2d 1335, 1359 (2d Cir. 1988) (emphasis added). As the district court properly held, Plaintiffs here have shown neither.

### A.   Plaintiffs Have Not Adequately Alleged Anticompetitive Conduct.

#### 1.   Plaintiffs Have Not Even Attempted To Plead Conduct that Is Anticompetitive or Exclusionary.

This Court has made plain that conduct is anticompetitive only if it is "without a legitimate business purpose" and "makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (quoting *Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.,* 507 F.3d 117, 124 (2d Cir. 2007)). This is the essential feature of an antitrust action: protection not of *prices*, but of *competition*. For this reason, the Supreme Court has explained that "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2." *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.,* 555 U.S. 438, 447-48 (2009). To state a Section 2 claim, Plaintiffs must accordingly plead that the allegedly unlawful activity had "an impact on consumers" that "impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *see Todd* v. *Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide.").

Even if Plaintiffs had adequately pled that "JP Morgan artificially move[d] settlement spreads," and that its "manipulation caused a tightening of silver futures spreads" (Br. 1)—which they have not, *see infra* Section I.A.2.—the complaints would not satisfy this requirement. While allegations of "artificial" prices and manipulation were central to Plaintiffs' time-barred and meritless CEA claims, they do not, standing alone, state an antitrust claim. Plaintiffs must instead plead *exclusionary* conduct that impairs *competition*. Aside from a few conclusory assertions (Br. 21, 29, 34), Plaintiffs do not even try to meet this burden. They do not allege that consumer choice was limited. They do not allege that potential competitors faced barriers to enter the market. They do not allege that the absence of competitors has allowed JPMorgan to charge different prices. In dismissing Plaintiffs' claims, the district court properly recognized that Plaintiffs were attempting to deploy the antitrust laws in furtherance of untimely and meritless commodities claims based on a failed trading strategy. (SPA-22-23.) This Court should similarly refuse to countenance such claims.

## 2. Plaintiffs Fail To Allege that JPMorgan Engaged in Any Uneconomic Trades or Manipulation.

Even under Plaintiffs' incorrect framework—in which "uneconomic" commodities manipulation constitutes a Section 2 violation—Plaintiffs do not adequately allege any "uneconomic" conduct. To the extent Plaintiffs' complaints

-24-

contain any specifics about JPMorgan (and there are few), they allege nothing more than normal trading behavior.

> ### a. The Complaints Fail To Plead that Plaintiffs' Supposed Benchmark, SIFO, Is a Plausible Indicator of "Accurate" Futures Prices.

To show that JPMorgan's conduct was "uneconomic," Plaintiffs principally contend that JPMorgan's bids/asks for long-dated silver futures (and its reports to the COMEX settlement committee) diverged from 12-month SIFO and JPMorgan's contemporaneous SIFO submissions. (Br. 27-31.) In light of this theory, unless 12-month SIFO is a plausible benchmark for long-dated silver futures spreads (it is not), Plaintiffs' claims must fail (they do).

As a threshold matter, Plaintiffs contend that a benchmark's plausibility is a fact issue that cannot be resolved on a motion to dismiss. (Br. 41 (citing nothing).) On Plaintiffs' theory, they could allege that the price of silver tracks the price of cheese, and that would be sufficient to defeat a motion to dismiss. Not so. Plaintiffs' chosen benchmark, like the rest of their allegations, must meet the threshold of plausibility that Rule 8 demands. *See*, *e.g.*, *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *13 (S.D.N.Y. Dec. 21, 2012). Accordingly, Plaintiffs must plausibly allege facts sufficient to justify their proposed benchmark.

The complaints do not come close. Most significantly, 12-month SIFO and the futures spreads contracts at issue in this case do not measure the same thing. 12-month SIFO estimates the price of silver one year into the future. (JA-462.) But each of the calendar spreads at issue in this case had at least one leg (and for most spreads, both legs) farther than one year into the future. (JA-467.) For example, Plaintiffs allege that on 14 days in February 2011, calendar spreads supposedly diverged from SIFO. (JA-482.) Taking one of those days, February 3, 2011, 12-month SIFO on that day estimates the price of silver one year in the future, on February 3, 2012. Plaintiffs try to compare this to the futures spread for December 2012 to December 2014—*i.e.* the estimate (as of February 3, 2011) of the difference in the price of silver between December 2012 and December 2014. (JA-482.) But as common sense suggests, prices at one point in the future are not a reliable indicator for prices at some other, much later point (or the difference between two such prices).[6]

Plaintiffs argue that the two nonetheless track one another because of "interest rate mechanics." (Br. 43.) While their position is unclear, Plaintiffs seem

---

[6]    Plaintiffs also point out (for the first time on appeal) that the period of time covered by 12-month SIFO in February, April and May 2011 overlapped by a few months with *one* of the three calendar spreads addressed by their expert's analysis, the December 2011 to December 2012 spread. (Br. 44-45.) Plaintiffs fail to explain how this helps them—the silver spread and 12-month SIFO dates they highlight still measure silver prices at different times, and are therefore inapposite.

to suggest that silver futures prices are simply a function of known interest rates and the costs of storage. (Br. 19-20, 43.) This position is as audacious as it is unpersuasive. The entire futures market is premised on the idea that future prices are uncertain, contingent on any number of potential variables, and traders (like Plaintiffs) seek to profit by predicting those future prices. (JA-459.) If futures prices could be calculated by mechanistically applying two observable and known variables, Plaintiffs would have figured out how to predict future prices, and would have little need for this lawsuit.[7] But of course, Plaintiffs have not solved the futures market, and their attempt to artificially chain futures prices to SIFO is both unsupported and unavailing.

The proof is in the pudding. As Plaintiffs' own complaints show, and as the district court found (SPA-60), 12-month SIFO and futures prices diverged for a number of periods during which Plaintiffs allege no manipulation. For example, the two metrics diverged during approximately March to August 2008, October to December 2008 and February 2009 to December 2009 (JA-464-65, 483-84), and again from February 2011 through November 2012 (JA-484-85). Plaintiffs even recognize that SIFO and silver futures spreads diverged during the

---

[7] Plaintiffs' position is tantamount to suggesting that the movement in the price of pumpkins during November must be a function of the movement in the price of pumpkins in the month leading up to October 31, rather than supply and demand before and after Halloween.

last of these periods, *a year and a half after the Relevant Period*, but make no attempt to explain how the supposed manipulation could have caused this divergence long after it ended. (Br. 48.) Accordingly, the period in February 2011 that Plaintiffs point to as indicative of "artificial" prices (and by inference, manipulation) is no aberration, but merely one of several times when SIFO and futures prices failed to converge. Plaintiffs protest that this criticism is based on nothing more than "JP Morgan's eyeballing of certain of the SAC's charts." (Br. 47 n.16.) That is how courts assess plausibility in cases such as this one—by considering the facts as alleged[8]—and tellingly, Plaintiffs nowhere argue that JPMorgan's observations about their data are incorrect.

Plaintiffs attempt to bolster their claims through supposed "expert" analysis, though the "expert" remains unidentified. According to Plaintiffs, this analysis purportedly shows a "strong predictive relationship"—an "R squared" of 86%—between 12-month SIFO and certain futures spreads just before January 2011, but then during the purported manipulation period, the R-squared dropped to zero. (Br. 30-31.) This expert analysis is unavailing. It looks at only a tiny period

---

[8] Contrary to Plaintiffs' suggestion (Br. 47), noting that Plaintiffs' allegations are contradicted by their own data does not constitute "impermissible fact-finding." *See Sveaas* v. *Christie's Inc.*, 452 F. App'x 63, 66 (2d Cir. 2011) ("[A] court need not feel constrained to accept as truth pleadings that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." (quotations and alterations omitted)).

-28-

of time, two years or less, and conspicuously omits each of the periods (March-August 2008, October-December 2008, February-November 2009, February-November 2012) when Plaintiffs' own data show that SIFO and futures spreads diverged.  (JA-464-65, 483-84, 484-85.)  In other words, Plaintiffs' "expert" intentionally overlooks all of the data points that would undermine his pre-ordained conclusion.  In short, while mere correlation between SIFO and futures spreads would be inadequate to show that they are meaningfully related, *see In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013), Plaintiffs have failed to allege even that much.

Unable to demonstrate the plausibility of SIFO as a benchmark, Plaintiffs rely heavily (Br. 41-43) on *In re Commodity Exch.*, 2012 WL 6700236, a commodities action, but that case does not support them.  In that case, plaintiffs alleged that defendants manipulated silver futures, and as evidence of artificial price, plaintiffs relied on the divergence of silver and gold prices.  The court rejected plaintiffs' proffered benchmark, reasoning that they failed to explain "why COMEX silver futures prices should be compared solely to the benchmark of gold prices."  *Id.* at *13 (quotations omitted).  The court then noted that in CFTC investigations of silver futures on which the complaint in that case relied, the CFTC "'routinely' compare[d] the price at which silver futures are traded on

-29-

COMEX . . . with [SIFO]," which provides "the benchmark value of silver in the marketplace." *Id.* This, according to Plaintiffs, proves that SIFO is the right benchmark for futures spreads. Plaintiffs are wrong.

The CFTC was examining "the relationship between the price of the *nearby* NYMEX silver futures contract"—*i.e.* the contract for the following month—and SIFO. *See In re Commodity Exch.*, No. 11-md-2213-RPP, Dkt. No. 93-2 at 7 & n.7 (emphasis added). Because the CFTC was considering futures contracts maturing in less than a year, there were tenors of SIFO (*e.g.*, one-month SIFO) that could supply an appropriate comparator.[9] Comparing *one-month* SIFO to the price of a futures contract expiring in *one month* makes a great deal of sense; Plaintiffs' attempt here to compare *12-month* SIFO to a contract expiring almost *four years* in the future, in contrast, does not.

Finally, Plaintiffs contend that "the district court did not find that there is a facially superior benchmark justifying its failure to credit Plaintiffs' SIFO allegations." (Br. 42.) The district court was not obligated to identify or

---

[9] This is not to say that the CFTC relied, as Plaintiffs do in this case, on a single benchmark. Indeed, the CFTC report shows that it compared futures prices to SIFO, gold prices, and the prices of two other metals. *In re Commodity Exch.*, 2012 WL 6700236, at *13. Plaintiffs' analysis here does not even come close to the rigor of the CFTC's investigation.

support a plausible benchmark. That was Plaintiffs' burden to meet, not the district court's (or JPMorgan's), and they failed to meet it.

> **b.    Plaintiffs' Remaining Allegations of "Uneconomic" Conduct Are Entirely Conclusory.**

None of Plaintiffs' assortment of other theories provides plausible support for their claim that JPMorgan's conduct was "uneconomic."

**Bid/Asks During the Close**. Plaintiffs point to their allegations that "JP Morgan's bid/asks made during the close"—and subsequent reporting to the settlement committee of those bid/asks—"were substantially out-of-line with earlier market activity." (Br. 29.) But as the district court found, Plaintiffs' allegations are both conclusory and self-contradictory: Plaintiffs allege that on 14 days "JP Morgan's representations to COMEX did not reflect 'where the market had been trading the entire day,' while also stating that, in fact, 'there had been no trading activity' that day." (SPA-57 (quoting JA-473-481).)

Plaintiffs attempt to argue (Br. 38-39) that the district court "failed to appreciate" the difference between "trading" and "trading activity"—a distinction Plaintiffs never raised before the district court, and that is found nowhere in their complaints. Plaintiffs now assert that "'trading activity' is a term of art that refers to actual consummated trades made during the close" (Br. 38), whereas the term "trading" refers to "spread bid/asks actively represented," but not necessarily

-31-

consummated (Br. 39 & n.12). Plaintiffs cannot put forth a new theory or attempt to *de facto* amend their complaint at this point. *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal." (quotations and alteration omitted)). But even if they could, their claims would remain entirely unsupported and unavailing, for two reasons.

*First*, for each of the 14 days Plaintiffs allege that JPMorgan made artificial bids/asks at the close, Plaintiffs do not identify a single trade, bid or ask from earlier in the day, or during the close. Plaintiffs' brief suggests that allegations about this market activity can be found in paragraphs 76-102 of the complaints (Br. 39), but they are not there (or anywhere else). Plaintiffs complain that the district court did not "cite *a single decision* requiring this level of detail to state a claim." (Br. 37.) That is wrong—the district court cited to and relied on both *Crude Oil* and *Cotton* as instances where allegations concerning "the uneconomic nature of defendants' conduct was far more patent than here." (SPA-61.) For example, in *Cotton*, plaintiffs alleged that defendants' demands for actual delivery of cotton were uneconomic because physical cotton was available more cheaply—by identifying, on specific days, the price of cotton in both the physical and futures markets. *See* Second Am. Compl., *In re Term Commodities Cotton*

*Futures Litig.*, No. 12-cv-5126, Dkt. No. 65 ¶¶ 57, 59, 60 (S.D.N.Y. June 10, 2013); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at \*10 (S.D.N.Y. Dec. 20, 2013) (citing Second Am. Compl. ¶¶ 52-60)).   Similarly, in *Crude Oil*, the court pointed to specific communications and trades on specific dates to show how defendants' conduct was uneconomic.  *See In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 49-50 (S.D.N.Y. 2012).    In contrast, the lone case on which Plaintiffs rely, *Fort Wayne Telsat* v. *Entertainment & Sports Programming Network*, 753 F. Supp. 109, 112 (S.D.N.Y. 1990), was decided before *Twombly* and does not reflect this Court's or the Supreme Court's current precedent on a plaintiff's pleading burden.  *See Biro* v. *Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (cautioning against relying on Rule 8 cases "decided prior to *Iqbal* and *Twombly*").

       *Second*, even if Plaintiffs had adequately alleged that JPMorgan's bids and asks diverged from those of other market participants—which they have not—Plaintiffs fail to explain why this would show uneconomic conduct (much less anticompetitive conduct within the meaning of the Sherman Act).  The futures market consists of traders exercising their business judgment and trading acumen to see trends and predict prices that others do not.  There is no rule that future prices predicted by the majority must be "correct," and that any deviation is anticompetitive.

-33-

**Backwardation**.  Plaintiffs also assert that at the time of JPMorgan's alleged misconduct, "the silver futures market entered into a sudden and dramatic state of backwardation," as if backwardation was by itself sufficient to suggest uneconomic conduct.  (Br. 30.)  But Plaintiffs' own complaints make clear that backwardation is "a basic pricing system in commodities futures trading" (JA-461), and that SIFO itself was backwardated during January, February and March 2011 (JA-504).  Indeed, the complaints allege that—using SIFO to predict the "correct" silver futures spread prices—those spreads *should* have been backwardated during the Relevant Period, including on 13 of the supposed "14 days on which JP Morgan submitted uneconomic silver futures bids/asks."  (Br. 2; JA-482; *see also* JA-486, 497, 505.)  Accordingly, the mere fact of backwardation does not establish anything.

Moreover, Plaintiffs do not plausibly allege that JPMorgan's conduct *caused* the backwardation.  At most, they allege that around the time JPMorgan was purportedly making "uneconomic" trades, the market also happened to be backwardated.  Again, this is nothing like the allegations held sufficient in *Crude Oil* and *Cotton*.  For example, in *Crude Oil*, the market abruptly shifted *on the same day* defendant dumped its massive supply of oil.  913 F. Supp. 2d at 50-51.  Similarly, in *Cotton*, the district court found that the market experienced a "U-turn" when defendants obtained control of "99% of the relative market."  2013 WL

-34-

9815198, at *24-25. In contrast, Plaintiffs do not allege a single trade, bid or ask by JPMorgan, and the 14 allegedly false submissions to the COMEX settlement committee all occurred *after* the market was already backwardated. (*Compare* JA-482 ("uneconomic" trades in February 2011), *with* JA-500 (market became backwardated in January 2011).)

**Other Conclusory Assertions**. Plaintiffs' brief and complaints include a grab-bag of other conclusory assertions that JPMorgan's conduct was "uneconomic." For example, Plaintiffs argue (in their brief, but not in their complaints) that JPMorgan made bids and asks "knowing that [they] would not be matched," but do not cite a single supporting factual allegation. (Br. 28 (citing JA-470-82).) Plaintiffs also assert that "JP Morgan made its trades, bids, and offers with no rational business purpose other than to restrict competition," and that JPMorgan "made daily uneconomic bids/asks during the close." (Br. 28-29; *see* JA-483 (allegations of "irrational" behavior); JA-466, 470-71, 472 (allegations of "uneconomic" trades).) These are no more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and need not be accepted as true. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In any event, the rational business purpose of JPMorgan's alleged conduct is obvious—JPMorgan had a different view of the markets than did Plaintiffs, and traded accordingly.

-35-

### 3.    The Complaints Do Not Adequately Plead Predatory Bidding.

Plaintiffs attempt to rescue their claims by ascribing to them the label of "predatory bidding." (Br. 33-35.)   To proceed on this theory, a plaintiff must plead that (i) "the alleged predatory bidding led to below-cost pricing of the predator's outputs," and (ii) "the defendant ha[d] a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power."[10]   *Weyerhaeuser*, 549 U.S. at 325.[11]   Here, Plaintiffs argue that JPMorgan "bid up prices of silver futures spreads" to artificial levels and then recouped the supposed losses by taking over Shak's spread positions and by making money on physical silver transactions. (Br. 33-35.)

By attempting to apply predatory bidding to these facts, Plaintiffs stretch the doctrine beyond its breaking point.   Futures markets do not have prototypical "inputs" and "outputs."   *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 905–06 (N.D. Ill. 2011) (because futures and

---

[10]    Monopoly power refers to a company's status as a dominant *seller* able to set supra-competitive prices.  Monopsony power refers to that of a dominant *buyer*, able to impose artificially depressed prices on sellers.  *See Weyerhaeuser*, 549 U.S. at 320-21.

[11]    As an illustration, in the pencil industry, one input is wood, and the output is pencils.  In a predatory bidding scheme, the predator would bid up the price of the input (*i.e.* wood), paying more than the output (*i.e.* pencils) would sell for.  The predator would forego short-term profits on pencils to force competitors out of business, but would then recoup those profits by forcing its wood suppliers to sell wood at artificially depressed prices (*i.e.* monopsony power).

the physical products they reference are "not easily defined as inputs or outputs," allegations of futures manipulation "do not fit neatly into the prototypical descriptions of . . . predatory bidding"). Plaintiffs awkwardly contend that the inputs in this case are "silver futures spreads," and the output is "the expected value of the silver bullion, storage and interest." (Br. 34.) But one does not purchase futures contracts in order to sell them as silver bullion, so the facts do not match the theory. *See In re Term Commodities Cotton Futures Litig.*, 2014 WL 5014235, at *9 (S.D.N.Y. Sept. 30, 2014) ("predatory bidding" involves an "output product that required the purchase of certain inputs").

Indeed, even accepting Plaintiffs' proffered inputs and outputs, the test for predatory bidding does not apply. The doctrine requires Plaintiffs to allege that a predator bid *up* the cost of the relevant input. But here, Plaintiffs argue that JPMorgan *depressed* the price of the "input," long-dated silver futures. (JA-482.) Predatory bidding also must lead "to below-cost pricing of the predator's outputs." *Weyerhaeuser*, 549 U.S. at 325. But Plaintiffs do not argue that JPMorgan sold silver (Plaintiffs' selected "output") for below-market prices; to the contrary, they allege (in a conclusory manner) that JPMorgan later *purchased* physical silver at depressed prices. (Br. 21.)

Similarly, Plaintiffs have not adequately alleged the second part of the predatory bidding test, namely the "dangerous probability" of JPMorgan recouping

-37-

any losses through monopsony power. *Weyerhaeuser*, 549 U.S. at 325. Again taking Plaintiffs' proposed "input" (futures spreads), Plaintiffs have failed to allege how, after their exit from the market, JPMorgan was able to purchase futures spreads for artificially depressed prices, or whether it recouped enough money to offset supposed losses incurred in bidding up input prices. Plaintiffs contend only that JPMorgan profited through unidentified purchases of physical silver and by taking over Plaintiffs' positions (Br. 35), but that has nothing to do with the pricing of the supposed inputs after Plaintiffs' exit. Plaintiffs also have not alleged any barriers to entering the silver futures spreads "market," and "[a] plaintiff is unable to plead a dangerous probability of recoupment when entry to the market can be achieved with relative ease," *Affinity LLC* v. *GfK Mediamark Research & Intelligence, LLC*, 547 F. App'x 54, 56 (2d Cir. 2013) (summary order) (citing *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)).

## B. Plaintiffs Fail To Allege that JPMorgan Acted with Anticompetitive Intent.

In addition to plausibly alleging anticompetitive conduct, Plaintiffs must also plead anticompetitive intent. *U.S. Football*, 842 F.2d at 1359. In an effort to meet their burden on this prong, Plaintiffs do not suggest that JPMorgan acted in order to profit off of its futures spreads; rather, they raise the much more

attenuated and conclusory claim that "one of JP Morgan's primary *possible* motives for manipulating the spreads to artificial levels was to benefit itself in the context of physical transactions with [silver] producers, which were based on COMEX silver futures price settlements." (JA-496; *see* Br. 48-51.) This is mere speculation. The sum total of Plaintiffs' *factual* allegations is that Grumet heard from one of his brokers, who in turn heard from another floor broker, that Gottlieb—the head of JPMorgan's silver trading desk—was "'back to backing' the settlement price with a customer of JP Morgan." (JA-495.) According to Plaintiffs, this means that "Gottlieb was passing along the COMEX settlement price to his customer." (JA-495.)

But throughout their complaints, Plaintiffs allege not a single fact to adequately plead that (i) JPMorgan actually had transactions with silver producers (including when, where, how many and with whom they occurred); (ii) that such transactions were priced according to COMEX silver futures price settlements; and (iii) that JPMorgan would have benefitted from a depressed deferred silver futures price. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2013) (dismissing commodities claims where plaintiffs failed to allege that they transacted on days where "futures contract prices were artificial" and "that their positions were such that they were injured"). By alleging only that "it was customary for metal trading desks to engage" in physical metals

-39-

transactions (Br. 49), and that it was "possible" for JPMorgan to have done so (JA-496), "plaintiffs here have not nudged their claims across the line from conceivable to plausible, [and so] their complaint[s] must be dismissed." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

Plaintiffs respond once again that the district court "failed to cite to a single case holding that such detail is required, especially in connection with motive allegations." (Br. 49.)  The burden of course is not the district court's, and Plaintiffs point to no authority showing that their burden is somehow relieved when pleading motive. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 723-24 (2d Cir. 2013) (applying *Twombly* to pleadings regarding defendants' state of mind).[12] Plaintiffs' attempt to avoid their burden to plead plausible factual support in alleging intent is no more compelling than it was for conduct.  *See* Section I.A.2.a., *supra*.

Plaintiffs also argue (for the first time on appeal) that by "not provid[ing] any liquidity to Plaintiffs prior to their exit from the market," this shows that JPMorgan had a motive to "squeeze Plaintiffs out of the market and

---

[12]    Plaintiffs also contend that JPMorgan's supposed physical silver transactions constitute "undisclosed self-dealing," citing to three securities cases.  (Br. 51.) Plaintiffs fail to explain how these cases are relevant to their antitrust claims.

obtain their positions at below market prices." (Br. 32.) Setting aside the fact that JPMorgan had no duty to provide Plaintiffs with liquidity, *see Adderall*, 754 F.3d at 134-35 (emphasizing the narrowness of the duty to deal doctrine), *of course* JPMorgan had an incentive to acquire positions cheaply. But there is nothing anticompetitive about that; such a motive is indistinguishable from the normal profit motive of any "rational, hard-nosed market actor" (SPA-40), and wholly inadequate to plead *anticompetitive* intent, *see U.S. Football*, 842 F.2d at 1359.

Finally, Plaintiffs contend that they should be allowed to seek discovery to flesh out their motive allegations (Br. 49 n.17), but they are incorrect. It is well-settled that "a plaintiff armed with nothing more than conclusions," as Plaintiffs are here, is not entitled to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-79; *see Twombly*, 550 U.S. at 558.

## II. THE DISTRICT COURT'S JUDGMENT CAN ALSO BE AFFIRMED ON THE BASIS THAT PLAINTIFFS FAIL TO ALLEGE THAT JPMORGAN HELD MONOPOLY POWER.

A Section 2 monopolization claim requires plausible allegations that a defendant possessed monopoly power in a relevant market. *Verizon*, 540 U.S. at 407 (2004); *Adderall*, 754 F.3d at 133. Plaintiffs' failure to satisfy this element of their Section 2 claim provides another ground for affirming the district court's dismissal of the complaints.

Plaintiffs may allege monopoly power in either of two ways: with "indirect evidence," which refers to pleading a high market share in a relevant market, or with "direct evidence," such as the ability to control price in a relevant market. *See*, *e.g.*, *Geneva Pharm. Tech. Corp.* v. *Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). A "relevant market" includes "all products 'reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York* v. *Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (quotations omitted). An alleged product market must therefore "bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd*, 275 F.3d at 200 (quotations and citations omitted).

Although the district court recognized that Plaintiffs' alleged "market" was "implausible," it held that plaintiffs seeking to plead monopoly power by alleging that defendants controlled prices are excused from that requirement. (SPA-27-28, 32-33.) This was error.

-42-

**A.    The District Court Recognized that Plaintiffs' Proffered "Market" Is "Implausible" but Held that Plaintiffs Were Not Required To Allege a Plausible Relevant Market.**

According to the complaints, the relevant "market" is the "silver futures spread market and in particular the 'long-dated' silver futures spread market." (JA-466.)[13]  The district court easily concluded that Plaintiffs' proposed market definition is "implausible" and an "*ipse dixit*," because Plaintiffs did not allege their "proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," instead "alleg[ing] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [Plaintiffs'] favor." (SPA-26-27 (quoting *Chapman* v. *N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).)  For example, the complaints do not claim that physical silver, OTC silver, or other silver derivatives products are not interchangeable (SPA-27-28)—a failing that is especially glaring as to physical silver, given Plaintiffs' claim that the physical silver and silver futures spreads "markets" are importantly connected. (JA-451, 454, 471, 496, 507); *see Minpeco, S.A.* v. *Hunt*, 718 F. Supp. 168, 171 (S.D.N.Y. 1989) (relevant market for Section 2 claim "consisted of [silver futures

---

[13]    Plaintiffs barely reference the geographic scope of their "market"—alleging only that the "geographic market comprises physical and electronic trading parameters of the listed silver futures contract on the COMEX"—but without saying  what those parameters actually are.  (JA-466.)

-43-

contracts] together with the supply of physical silver deliverable on those expiring contracts"). On balance, the court found a "complete absence of adequate pleadings on the issue of defining the market." (SPA-32 (emphasis omitted).)

Notwithstanding the court's rejection of Plaintiffs' chosen "market," the court found Plaintiffs' monopoly power allegations "sufficient at this stage" because Plaintiffs submitted "direct evidence of anticompetitive effects, namely control over prices." (SPA-32.) The court stated "that a plaintiff who alleges monopoly power by means of direct evidence of price control" need not "define the market with the same precision and punctiliousness (*e.g.*, to exclude potential interchangeable products) that a plaintiff who alleges monopoly power solely by means of alleging the defendant's market share must." (SPA-32-33.) Therefore, the court concluded that Plaintiffs' "direct effects" allegations were satisfactory because they were made "with reference to a particular market," even though the court had already found that particular market to be "implausible." (SPA-32.)

### B. To Allege Monopoly Power, a Complaint Must Allege a Plausible Antitrust Market.

This Court has never excused plaintiffs who plead "direct evidence" of monopoly power—that is, an effect on prices or an exclusion of competition— from alleging a plausible relevant market. To the contrary, *Heerwagen* v. *Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006), explained that "[a] showing of

-44-

monopoly power is a substantive element of plaintiff's monopolization claim, and plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition." *Id.* at 229 (citation omitted); *see Chapman*, 546 F.3d at 237.

This Court reiterated the significance of plausible market allegations to Section 2 claims just this year, in *Concord*, which held that, in order to survive a motion to dismiss, a complaint must "assert[] sufficient facts to allege plausibly the existence of both a product and geographic market"—and "explain why the market it alleges is the relevant, economically significant product market." 817 F.3d at 53, 54 (quotations omitted). The Court stressed that the relevant market analysis is "essential for assessing the potential harm to competition from the defendants' alleged misconduct" and must be satisfied for Section 2 claims in particular, "because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy the competition." *Id.* at 53 (quotations omitted). Although it is unclear whether the *Concord* plaintiffs proffered indirect or direct evidence of market power, this Court drew no distinction between the two approaches. *Id.* Because the *Concord* plaintiffs failed to plead a relevant market, this Court held that the district court correctly dismissed their Sherman Act claims. *Id.* at 55.

-45-

To hold that plausible market allegations were not required to allege monopoly power under the "direct evidence" theory, the district court relied principally on a passage from *Tops Markets, Inc.* v. *Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998), where this Court stated that monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, *or* it may be inferred from one firm's large percentage of the relevant market." (SPA-24-25.) But neither *Tops Markets* nor other Second Circuit cases has ever held that a Section 2 plaintiff need not plead a relevant market when alleging market power through direct evidence. *See Concord*, 817 F.3d at 53-54; *Chapman*, 546 F.3d at 237; *Heerwagen*, 435 F.3d at 229; *accord McWane, Inc.* v. *F.T.C.*, 783 F.3d 814, 828 (11th Cir. 2015) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization case arising under section 2." (quotations and alteration omitted)).[14] To the contrary, in *Tops Markets*, when this Court

---

[14]    A handful of district court decisions in this circuit have made the same error as the district court below. *See In re Zinc Antitrust Litig.*, 2016 WL 3167192, at *18 (S.D.N.Y. June 6, 2016); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 454 (S.D.N.Y. 2015); *Cotton*, 2013 WL 9815198, at *24; *Crude Oil*, 913 F. Supp. 2d at 51. These errors all flow from a misinterpretation of dictum in *PepsiCo*, 315 F.3d 101, followed by citations to one another. In *PepsiCo*—on review of a summary judgment decision—this Court noted in dictum that there was "authority to support [the] claim that a relevant market definition is not a necessary component of a monopolization claim." *Id.* at 107 (citing *Tops Markets*, 142 F.3d at 98). The court recognized elsewhere, however, that "numerous cases state that defining a relevant market is generally a necessary component of analyzing a
*(footnote continued)*

-46-

considered whether there was "direct evidence" of monopoly power, it did so by considering a particular market, the "Jamestown market area." 142 F.3d at 98. Similarly, in *Heerwagen*, this Court assessed "direct evidence" allegations "with reference to a particular market." 435 F.3d at 229.

The district court misread this phrase from *Heerwagen* as supporting a difference between "*reference* to a particular market"—required for those alleging direct evidence, as in *Heerwagen*—and "*definition* of a relevant market"—required for those offering indirect evidence. (SPA-25 (emphasis altered).) *Heerwagen* never draws this distinction, and indeed requires plaintiffs relying on direct evidence of monopoly power to "establish the relevant market," which sounds very much like "defining" the relevant market. 435 F.3d at 229. *Heerwagen* also assesses the plaintiff's market allegations by reference to "cross-elasticity of demand" and "the availability of substitutes"—the precise factors that determine market definition. *Id.* at 228. Similarly, in *Chapman*, the Court conducted an "analysis of the interchangeability of use or the cross-elasticity of demand," without specifying whether the plaintiff was offering direct or indirect evidence of

_____

*(footnote continued)*
monopolization claim." *Id.* at 108. The court ultimately affirmed the grant of summary judgment dismissing the case—so it did not decide whether a Sherman Act claim can be proven without proving a relevant antitrust market. 315 F.3d at 107-08.

-47-

market power. 546 F.3d at 237-38. This Court's precedents thus reinforce that plaintiffs alleging market power by direct evidence must allege control of prices in a plausible, relevant antitrust market.

Even if the district court were correct that less detail is required to allege a plausible market when attempting to plead direct evidence of monopoly power, plaintiffs cannot proceed by reference to a "market" that the district court affirmatively found implausible. *See Todd*, 275 F.3d at 200-01. Otherwise, "reference to a particular market" actually means "reference to some product (or, here, some handful of contracts)." The district court's decision is alone in having held a market wholly "implausible" while also holding "market power" allegations to be sufficient. (*Compare* SPA-27-28, 32-33, *with Zinc*, 2016 WL 3167192, at *18-19 (finding that plaintiffs plausibly alleged the market as "SHG zinc . . . for which there are no reasonable substitutes"), *and Crude Oil*, 913 F. Supp. 2d at 54 ("Plaintiffs' relevant market definition is not so implausible as to warrant dismissal.").) The district court's pleading "standard" effectively relieves Section 2 plaintiffs of the burden to plead any market at all, and cannot be correct under this Court's precedent. Thus, dismissal of Plaintiffs' Section 2 claim is also warranted for failure to plead a plausible antitrust market.

## III. THE DISTRICT COURT'S JUDGMENT CAN ALSO BE AFFIRMED ON THE BASIS THAT PLAINTIFFS LACK ANTITRUST STANDING.

To prevail on their Sherman Act claims, Plaintiffs must establish antitrust standing, which includes pleading that they suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) (quotations and alteration omitted); *see Atl. Richfield Co.*, 495 U.S. at 344 (plaintiffs "can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior"). The touchstone of an antitrust violation, including a Section 2 monopolization claim, is "controlling prices or excluding competition," *PepsiCo, Inc.*, 315 F.3d at 108, and so Plaintiffs must allege that they suffered harm arising from one of those ills. They have failed to do so.

While Plaintiffs allege that they exited the "market," they fail to explain how Defendants' alleged conduct had any impact on *competition*. *See USAirways Grp., Inc.* v. *British Airways PLC*, 989 F. Supp. 482, 489-90 (S.D.N.Y. 1997) ("general and conclusory allegation" that plaintiff's exclusion from market resulted in "limited consumer choice" did not allege antitrust injury). Specifically, Plaintiffs have failed to allege that their injury resulted from actions by JPMorgan that diminished competition in the market for "long-dated silver future spreads"—

-49-

and in fact do not explain how competition in that "market" is in any way worse off.  *See NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"); *Sell It Soc., LLC* v. *Acumen Brands, Inc.*, 2015 WL 1345927, at *4 (S.D.N.Y. Mar. 20, 2015) (plaintiff lacks antitrust standing where it fails to allege "the amount of competition that defendants' conduct foreclosed") (quotations, citation and alterations omitted).   For example, Plaintiffs do not allege that the conduct that supposedly injured them led to supracompetitive prices, diminished consumer choice, or excluded competitors.

At most, Plaintiffs allege (in conclusory and implausible terms) misconduct directed at them, but it is well-established that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."   *Brooke Grp.*, 509 U.S. at 225.  Accordingly, Plaintiffs' claims must be dismissed.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  October 12, 2016
       New York, New York

                    Respectfully submitted,

          SULLIVAN & CROMWELL LLP

           /s/  Daryl A. Libow
          Daryl A. Libow
          (libowd@sullcrom.com)
          Amanda F. Davidoff
          (davidoffa@sullcrom.com)
          Nicholas M. DiCarlo
          (dicarlon@sullcrom.com)
          1700 New York Avenue, N.W., Suite 700
          Washington, D.C.  20006-5215
          Telephone:  (202) 956-7500
          Facsimile:  (202) 956-7571

          Akash M. Toprani
          (toprania@sullcrom.com)
          125 Broad Street
          New York, NY  10004-2498
          Telephone:  (212) 558-4000
          Facsimile:  (212) 558-3588

          *Attorneys for Defendants-Appellees*
          *JP Morgan Chase & Co., J.P. Morgan Clearing Corp.,*
          *J.P. Morgan Securities LLC, and*
          *J.P. Morgan Futures, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,374 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

  /s/ *Daryl A. Libow*
Daryl A. Libow

Dated: October 12, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October 2016, I caused true and accurate copies of the foregoing Brief to be served electronically via ECF, upon the following counsel:

David E. Kovel
Andrew M. McNeela
Kibby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Email: dkovel@kmllp.com
Email: amcneela@kmllp.com

*Attorneys for Plaintiffs-Appellants Thomas Wacker, Mark Grumet, Daniel Shak, and SHK Diversified, LLC*

/s/ *Daryl A. Libow*
Daryl A. Libow